## BRACHER v. HAT-SWEAT MANUF'G CO.

*(Circuit Court, S. D. New York. April 5, 1892.)*

ASSIGNMENT OF PATENTS—CONSTRUCTION OF CONTRACT.

Where a manufacturer owning certain patents, in pursuance of an agreement to form a corporation which is to include the properties of several rivals, and of which he is to become the general manager, assigns his patents to the corporation without reservation or conditions, except that the company is not to assign them to any one else while he continues to hold his allotted proportion of its stock, such assignment cannot be considered as subject to the condition that he shall be retained in his position as manager, and his discharge by the company, whether with or without cause, will not revest in him any interest in the patents.

In Equity. Suit by Thomas W. Bracher against the Hat-Sweat Manufacturing Company. Bill dismissed.

*Arthur v. Briesen* and *Esek Cowen*, for complainant. *Julien T. Davies* and *John K. Bennett*, for defendant.

COXE, District Judge. Nominally this is an action for the infringement of two letters patent. Its real purpose, however, is to test the validity of an instrument by which the complainant assigned these patents to

the defendant in March, 1882. The complainant charges—*First*. That his signature to this instrument is forged. *Second*. That if the signature is genuine the instrument itself, or the greater part thereof, is fraudulent. *Third*. That if the instrument is genuine in all respects, still, it was improperly used, and did not operate to transfer a valid title to the defendant.

The first of these charges was disposed of at the argument. There is nothing in the record, worthy the name of evidence, to impeach the genuineness of the signature. Among the many witnesses who prove it to be genuine is the complainant himself.

The second charge, while not so overwhelmingly disproved, has little of a substantial nature to rest upon. It is said, conceding that complainant signed the last sheet of the assignment, that the other sheets were added afterwards. The reasoning in support of this charge is as follows: *First*. The last page was press-copied before the signature of complainant was affixed. The second and third pages never were copied at all, and the first page was copied after being recorded in the patent-office. *Second*. On the last two pages there are three brad-holes and on the first two pages two brad-holes. Pages 1 and 2 are not numbered and pages 3 and 4 are numbered. *Third*. The body of the paper and the name of the first subscribing witness is in one ink, the signature of complainant and the signature of the second witness is in another ink. *Fourth*. The previous pages have been spaced to match exactly the last page of the assignment. Other alleged peculiarities are pointed out, but the foregoing are the principal ones. Assuming that all of these propositions are fully established, they absolutely fail to sustain the grave accusations made against the defendant and its agents. Fraud must be proved; it cannot be inferred or maintained by speculation or conjecture. To destroy property rights and strike down private character for the reasons advanced would be alike without precedent and without principle.

But the foregoing propositions are not established. The testimony that the sheets of the assignment were copied at different times was rendered utterly valueless when the writing was subjected to tests made by the very witness who pronounced the instrument ungenuine because of these supposed discrepancies. The proposition that the last page was originally part of an assignment of leases, from which it was removed and fraudulently attached to the three preceding pages of the instrument in question, is rendered untenable by an examination of the last page itself. The first sentence on the last page which the complainant must have seen is as follows:

"Of its legal representatives to the full end of the respective terms for which said several *letters patent,* and each of them, are granted."

After this sentence, which unquestionably does not refer to leases and unquestionably does refer to letters patent, appears the assignment of licenses referred to. It is as follows:

"And I do hereby *further* assign, sell, transfer and set over unto the said Hat-Sweat Manufacturing Company any and all interest whatsoever, that I

have or may have in, to and under existing contracts and licenses, in, to and under the said several inventions and letters patent or either of them and amounts due thereon or to accrue by reason thereof."

Other circumstances, characterized as suspicious, have been fully explained. When to all this is added the fact that there was no reason or motive for the commission of crime; that the defendant, as will be seen later on, was entitled to an assignment of the patents in question, and, if the complainant had refused, a court of equity would have compelled him to assign, the last suspicion of wrong-doing disappears and not even the shadow of fraud remains. It thus appears that in March, 1882, the complainant, by an instrument, executed without fraud, duress or mutual mistake, assigned to the defendant the patents which the defendant is charged with infringing.

It might, perhaps, be said that the court need not proceed further, but should dismiss the bill at this point. The theory upon which the action rests, as expressly charged in the bill, is that this assignment was never made or executed by the complainant "in any way, shape or manner whatsoever." This proposition has been completely overthrown. Such being the condition of the pleadings and proofs it is a grave question whether the action in any view can be maintained. Apparently, there is but one answer to the question: Can one who does not hold the legal title to a patent treat as an infringer one does hold that title? However, as both parties have devoted the greater part of their argument to a consideration of the construction to be placed on the assignment, I proceed to an examination of the question whether that instrument transferred a valid title to the defendant.

Prior to 1881 the hat-sweat industry was in the hands of several rival manufacturers, viz., the complainant, Stetson, Greenwood, Bigelow and the Blanchard Overseam Company. Competition was disadvantageous to all. An effort was, therefore, made to consolidate these conflicting interests. With this object in view an agreement was entered into between the complainant and Mr. John B. Stetson, which, after reciting that the complainant had assigned certain patents to Henry B. Renwick, as trustee for a company about to be formed, provides as follows: Stetson was to organize the company, the patents were to be assigned by Renwick to the new company upon the joint request of the attorneys for the respective parties, $37\frac{1}{2}$ per cent. of the capital stock of the new company was to be delivered to complainant. It was agreed further that the board of directors of the company was to consist of five, two of them to be designated by complainant, who was to be employed as general manager of the manufacturing department. He was to devote his entire time to the business and was to receive a salary of $6,000 per annum, payable monthly. It was also stipulated that the patents assigned by complainant to the company should not be assigned, sold or transferred by the company, except upon the written consent of complainant, so long as he continued to own two-thirds of the $37\frac{1}{2}$ per cent. of stock. Complainant further agreed that as soon as the company was formed and the $37\frac{1}{2}$ per cent. of stock issued and delivered to him, he would simulta-

neously transfer to the company his entire business, both of manufacturing and selling sweats for hats. The assignment by complainant to Renwick, as trustee for the Hat-Sweat Company about to be formed, was executed at the same time and provided that Renwick should assign the patents therein mentioned "to the said company when formed, or as soon thereafter as he may be requested so to do; the terms and conditions contained in an article of agreement bearing even date herewith (Stetson agreement) having first been fully complied with, otherwise *this* assignment to be void."

The assignment to Renwick as trustee contains also the following clause:

"And I do further covenant and agree that as soon as the said company shall have been duly organized, if requested, I will execute an assignment, assigning and transferring all my right, title and interest in and to the said several letters patent, and each of them, and said application above named, *to the company direct*, together with all claims for past infringement of the said several letters patent, or any of them, likewise any and all existing contracts and licenses under the said several letters patent and amount due thereon."

It will be observed that the assignment in dispute—March, 1882,—is in exact compliance with the foregoing stipulation.

On the 3d day of January, 1882, the complainant signed a full and absolute release, indorsed on the Stetson agreement, acknowledging that Stetson "has faithfully complied with and carried out each and every of the terms and conditions of the said agreement." On the same day the company, by resolution of the board reciting and confirming the Stetson agreement, employed the complainant as general manager at a salary of $6,000 per annum, payable monthly. Mr. Renwick did not accept the trust. That he had absolutely declined in the spring of 1882 does not appear. Indeed, it seems reasonably clear that both parties expected that he might be induced to accept even long after this period. However this may be, the fact remains that Renwick had nothing to do with the transaction from its inception to its close.

What then was the situation in March, 1882? The Hat-Sweat Company had been organized, all the parties having transferred and assigned their property and patents to the company as agreed. The complainant had received his stock, had been appointed general manager at the agreed salary, had transferred his business, apparently without condition, to the company, and had received over $8,000 for his plant. In short, every condition precedent had been performed. Everything that Stetson, or the company, adopting his agreement, promised to do as a consideration for the assignment had been done. This is virtually conceded. Why, then, should the complainant not have assigned the patents? Why should he not have kept his agreement? It is admitted that he should have assigned, but it is argued that the assignment should have contained a condition, *in hæc verba*, making it void unless the company, through the remainder of complainant's life, complied with the terms of the Stetson agreement and employed him as general manager. Or,

it is said, the trustee might have inserted in the assignment a covenant on the part of the company that they would comply with the executory terms of the Stetson agreement, or a separate stipulation should have been executed on the part of the company agreeing to carry out the terms of that agreement.

In other words, it is insisted that a valid title to the patents was conditional upon the continued employment of the complainant, and that an assignment which did not convey such a defeasible title was in violation of the trust, null and void, and transferred no title to the defendant. There is nothing in the negotiations from the beginning to the end to indicate that it was ever in the mind of either party that such a condition should be attached to the assignment. A recital in an assignment of a patent of a memorandum of reciprocal obligations, like that contained in the Stetson contract, would have been out of place. The idea never appears to have assumed a tangible shape until, in 1887, the complainant was seeking a plausible theory upon which to attack the defendant. He agreed to assign without condition. He did assign without condition, and a short time afterwards directed the trustee to assign without condition. Can it be possible that the complainant would have sanctioned the unconditional direction of May 23d if he intended that Mr. Renwick should add a condition regarding his employment based upon the Stetson agreement? Would he have used the following language:

"You are hereby requested to assign, transfer and set over unto the Hat-Sweat Manufacturing Company, the property conveyed to you by the assignment from Thomas W. Bracher to Henry B. Renwick and now held in trust by you for them and on behalf of said company. This request is made in accordance with a certain agreement between Thomas W. Bracher and John B. Stetson, dated June, 1881, *each of the terms and conditions contained in said agreement having been fully complied with*."

I am convinced that such an anomalous assignment was not intended and that the defendant could not have been compelled to accept it. It would have been valueless. No one would have purchased patents conveyed by such a title. The other parties would not have transferred their patents by absolute assignment and permitted the complainant to occupy a relation to the company which would enable him at any time to destroy the company's property and turn its title deeds to ashes. And, finally, the others would never have transferred to the complainant 2,250 shares of stock in exchange for such an infirm and worthless title. It seems incredible that intelligent men could have intended to organize a successful company with the title to its property dependent upon its succeeding should a dispute arise between it and one of its servants over the terms of his employment. After the complainant had received the stipulated consideration it was his duty to do what he had agreed to do and what he had been paid for doing, viz., transfer his patents to the company. If, thereafter, he was improperly discharged he had his remedy at law, which he could at any time assert. It was manifestly the intention of the parties that if there was a breach of any of

the conditions subsequent they should be left respectively to their remedy at law.

Considerable speculation has been indulged in, on the briefs, as to the fate of the Renwick trust, etc. I do not deem it essential to enter into this interesting inquiry, for it must be borne in mind that the question here is not whether the defendant has a perfect title, but whether the complainant has a title which will enable ￢ im to sue infringers. Having, for a good consideration, twice assigned all title cut of himself it is not easy to see by what mysterious process he acquired it again. The purpose of the Renwick trust was obvious. It was to hold the patents for the benefit of all, pending the formation of the company. The moment the company was formed and the consideration paid the trust-deed was unnecessary. It would have been more orderly, certainly, to have had the trust executed. But the defendant was guilty of no wrong in demanding an assignment direct from the complainant. The latter had been fully paid for the assignment and had agreed to make it.

If the foregoing views are correct the question whether the complainant was rightfully discharged or not is of no materiality to this controversy. All the contemporaneous agreements, everything that was said, written and done by the parties from the beginning to the end of the transaction only tend to strengthen the impression that it was the intention of all concerned that after the transfer of the stock and the employment of the complainant by the defendant, their relations thereafter should be the ordinary ones of employer and employe. If the complainant failed to keep his agreement the defendant could recover damages, but not the stock transferred to him. If, on the other hand, the defendant broke its agreement the complainant could recover damages of the defendant, but not the patents transferred to it. Each party had his remedy at law if the other failed to keep the agreement. The complainant's conduct since his discharge need be referred to only as confirmatory of this construction, and as it tends to throw light upon the actual intent of the parties. After his discharge in September, 1882, he made no sign until this suit was commenced in 1887. Why did he not immediately offer to return his stock and demand his patents? The excuse he gives for thus sleeping upon his rights is wholly inadequate. If the situation was then what he now says he supposed it to be, his inactivity is unaccountable. If a defeasible assignment was on record and the event which reinvested him with the title had occurred, why did he not assert his rights and reclaim his property? Instead of doing so he sold his stock for $60,000 and still retains the money.

The bill is dismissed.